The court will hear argument now in the case of state of green against the city of Indianapolis. Mr. Flaxman. Thank you your honor. Thank you your honor. May it please the court. This case arises from the fatal shooting of Andre Green by Indianapolis police officers. The case is proceeding only against the individual officers. There was a claim against the city of Indianapolis which was resolved against the plaintiff by the district court that is not involved in this appeal. District court granted summary judgment to the officers based on a conclusion that the officers acted lawfully or with with qualified immunity in shooting Mr. Green. Our position in a nutshell is that there are disputed questions of material fact that require a trial to resolve. In a nutshell Mr. Green who was then 15 years old was suspected of a carjacking and was driving in the city of Indianapolis. Six police cars were following him in a just about all of the cases involving deadly force and car and fatal and cars there was no speeding. Andre was driving lawfully. It seems like he was stopping at traffic signals. It seems like he's signaling for turns. He then ended up in a cul-de-sac and the officers sought to stop him from leaving and to do a felony stop. That's when the the facts of this case started to develop. Officer Phillips who was not a defendant in this case got out of her car and tried to get Andre to stop his car. Andre drove his car into Philip's vehicle. Apparently he was trying to escape and that's when the three defendants in this case started to argue with great passion and sincerity that the officers shot into Andre's car after it came to rest that they could not have reasonably believe that killing him was necessary to prevent harm to anyone and that this requires a trial. But that's not this case. Mr. Andre was not killed when he was sitting in the officer stopped shooting. Andre opened the door of his car and acted as if he was okay. He acted as if he was had not been hit. That's from Officer Defendant Stewart and Defendant Mingering. The evidence from the coroner's report, the two of them came from the back. One from the back which entered and disrupted, I think is the phrase, Mr. Green's heart. The other which entered through the right leg and did severe fractures to the tibula and the fibula. If this was if we were arguing to a jury, we would say, you really think he's walking with that gigantic fracture to his right leg? And how do you explain the bullet, the two bullets in the back when he's sitting in the car? There's no evidence that any officer shot him from the back. There's no evidence that he was twisting in a way that would allow the officers to shoot him while he was sitting in the car. This is a case where there's an unexplained, there are two unexplained bullets in the back. Mr. Faxman, good morning. If we set aside, if we find we have to set aside Mr. Harmoning's would have killed Mr. Green almost immediately. I mean, I know that you noted that that would be a fair interpretation of the coroner's report. But reading the coroner's report, I don't see anything that addresses how quickly that bullet would have killed Mr. Green. That's correct. And I don't think that we're relying on Mr. Hamerling for the opinion that a bullet through the heart would that disrupted the heart would cause instantaneous death. I think that's something that the coroner would be asked about at a trial. But what we do have, we have these two bullets in the back. We don't need Mr. Hamerling to give an opinion that when the coroner says there was an entry wound in the back to the chest and an entry wound to the back of the right leg, we don't need an opinion about that. We have the coroner saying that from what he saw. That's a fact. Whether Mr. Green would have been able to stand up and act as the officer said that there was no blood, he acted like he hadn't been hit. That's a question for the jury. And it might be that coroner would say, I can't say how long he would be able to live with that bullet was through the heart. We don't have data on that. It's not like cutting off his head. But it's something that raises a jury question. Where did those two bullets come from in the back? That's not consistent with the officer's testimony that they were shooting at him when he was in the car, when they thought he was trying to hurt officer Phillips or hurt somebody else. That's an unexplained fact that requires a trial. And we're relying on Mr. Hamerling or his testimony would be helpful to the jury for his opinion that the car was stopped when the officers were shooting at him. And that's consistent with the conflicting testimony of the officers when it's viewed in the light most favorable to the plaintiff. The officers have different stories about what happened to the car. Did Andre's car, was there one collision, as defendant Stewart said? Were there two collisions, as defendant Connie said? Did officer Mengerich talked about the Lamborghini door? And we explained that we think he meant a scissor door. And a scissor door opens wide so you could get into it. The picture that's in the record doesn't show a scissor door of a door going up. So viewed in the light most favorable to the plaintiff, I would argue that they shot him, as Mr. Hamerling says, after he was stopped. And then when he got out of the car, the officer said he looked like he hadn't been shot. And then he ended up with two shots in the back, one in the back and one in the back of his leg. That, we argue, requires a trial. Doesn't require, doesn't permit summary judgment. The district court said, well, the only evidence you have, plaintiff, that he was shot in the back comes from your expert, Mr. Hamerling. And that's a mistaken view of the record. The reference in the summary judgment submission, I think that's ECF number 44, page 10, cites to Mr. Hamerling's report and also cites to the autopsy report. And the autopsy report is from the guy who is a pathologist who looked at the wounds and said, this is an entry wound on the back, on the back and back of the leg. We don't have any explanation for how those happened that's consistent with the defendant's story. That's what trials are for. The other issue that I'd like to raise is about the exclusion of the expert's report or the exclusion of opinions from the expert. I don't think, there's this discussion about timeliness and whether exclusion is automatic. There's confusion from reading the record from the orders that if we apply a strict textual reading to the orders, the report was filed on time. Mr. Hamerling, as most experts do, given the opportunity, offered opinions about things that he's not qualified to offer opinions about. Like he can't testify about pathology, but he does have evidence that could be helpful to the this hysteria shooting where one officer shoots and other officers shoot, not because they have seen something that causes them to believe it's time to shoot, but because the other officers are shooting. If there are any further questions, I would be happy to answer them. Otherwise, thank you. Mr. Upchurch. Thank you, Your Honor, and may it please the court. My name is Andrew Upchurch, and I represent the officers, Mark Cloney, Adam Mendrink, and Vincent Stewart, as well as the city of Indianapolis. And we respectfully request that this court affirm the district court's grant of summary judgment for three reasons. First, the estate's version of events, their story in this absolutely depends on the expert testimony of William Harmoning. Mr. Harmoning is the only witness, and his testimony is the only evidence that has been designated that suggests that there was a fatal wound in this case. The autopsy report, which Mr. Harmoning relied upon to reach that opinion, does not identify a fatal wound. Instead, if you look at the first page of the autopsy report, it says that the cause of death is from multiple gunshot wounds. So based on what the report says there, this idea that there was a fatal shot is not something that is established by a pathologist in this case. Furthermore, the pathologist did not conclude that any shot would have killed Mr. Green immediately. And this is an essential point for the appellant's case, because the theory here is that Mr. Green could not have exited the Nissan after sustaining what Mr. Harmoning has characterized as the fatal shot. However, there is simply no evidence supporting that fact. One of the cases that we submitted as a supplemental filing in this case is the estate of Bigert. And in that case, this court recognized that in order for you to have a genuine issue of material fact, that has to be based on some form of evidence. And indeed, that's also consistent with the Supreme Court's ruling in Scott v. Harris. Essentially, in order to have one of these disputed facts, the estate is going to need some form of admissible evidence that is going to establish not only that there was a fatal shot, but somehow Mr. Green could not have exited the Nissan after sustaining that fatal shot. There's simply no evidence supporting either of those conclusions. So for that reason, we don't believe that there is any evidence supporting this theory that Mr. Green was shot after he had exited the vehicle. Well, as I understand it, the bullet that transected Mr. Green's heart entered the mid or lower right portion of his back and traveled upward toward the heart. Does that at least present the possibility that he was no longer struck by that bullet? I mean, given that the officers were firing at him from the front end, front side of the car? Certainly, Your Honor. So it is the officer's position in this case that first of all, you would need expert testimony to establish what the bullet would have done inside of the body. We've cited case law from the Southern District of Indiana that has concluded, essentially, the court says a forensic pathologist would be qualified to offer that kind of opinion. Without some form of testimony that says, you know, this is how the bullet entered into the body and this is how it would have traveled, there'd be nothing more than speculation supporting the conclusion that he was, for instance, one of the things that the estate has argued in this case, shot from behind. However, we believe there's a number of different scenarios where this shot could have come from an officer standing in front of the vehicle. And due to the fact that Mr. Green is moving inside of the car, in fact, if you look at our reply brief at the trial court, one of the scenarios that we offered was a possibility that maybe he put his hands up in a defensive position and moved away from the incoming shots. We believe that would have been a natural reaction to the shots that were coming at Mr. Green and he could have sustained the wound in that way. Now, as- Is it crucial to your case that the officers did not shoot once Mr. Green began to alight from the car? I'm sorry, once he began to- Once he began to get out of the car. Is it crucial to your case that they ceased fire as he began to get up out of the car? No, your honor. We believe that's important. Certainly, your honor. So we believe that the evidence supports that scenario that he was shot while he was inside of the car. However, due to the threat that Mr. Green posed to the officers as well as to the public, we believe it's not clearly established that it would have been impermissible to use force in that situation. This goes to one of the cases that's cited by the estate in their briefing is the Strand case. And Strand dealt with what kind of evidence there was showing that a suspect had been subdued prior to the use of deadly force. That particular case, there was evidence that suggested that it could have been 5, 10, 15, 21 seconds in between the suspect getting up, putting his hands up and saying that he surrenders twice. Here, there's simply no evidence that supports that there was any amount of time that would have elapsed after Mr. Green was getting out of the vehicle. None of the officers observed him exiting the vehicle. So that would not have been a fact in circumstance that they considered when they were using their force in that situation. And I believe it's important to note that, and this is one thing that's omitted from the estate's opening brief, is the carjacking in this case also involved a shots fired incident. And when Officer Mindrink received the report, he was informed that the driver of the vehicle was the one who had placed a gun in the victim's face and taken the keys from the victim, the carjacking victim. And then shortly thereafter, four shots were fired from the vehicle. So all of the officers have given statements and testimony that they believed that the driver of that vehicle was armed. They've also given statements that they did not know where Officer essentially, when they say they're firing because the vehicle is accelerating towards them. However, in that situation, had Officer Phillips been run over by the vehicle, had she been on the driver's side, she would have been in the immediate vicinity and still at risk as Mr. Green is exiting the vehicle. And I think it's also important to consider the fact as well, if he's exiting at that time, he's essentially jumping out of the vehicle as shots are being fired, which in that sort of situation, the reasonable officer would not have viewed that as a surrender, as more of something, maybe you're going to come out shooting, I believe would be a more reasonable interpretation of that sort of action, Your Honor. I gather that Officer Phillips got out of her car to give Mr. Green the verbal commands to stop the car, exit the vehicle and show his hands. How plausible is it that she thereafter left the view of her fellow officers such that they had reason to be concerned that she might be injured if the Nissan struck her car? Yes, Your Honor. So to explain that point, the testimony establishes that Officer Mendrink observed Officer Phillips getting out of her vehicle and giving those commands. Officer Stewart and Officer Cloney, it appears, exited their vehicle after Officer Mendrink had exited the vehicle. And what they observed initially is their focus is on a fleeing suspect. There's a suspect gets out of the vehicle and starts running. And actually, both of them began pursuing that suspect. And at that time, noticed that there was the Nissan was going to be traveling through the path. So it's our position that two of those officers would not have been aware that Officer Phillips was on that side of the vehicle. Another thing that must be considered, and there's video evidence of the walkthrough of the scene. And I think it's very important to look at that because it shows the proximity of where all the officers were, where the vehicles were located, particularly at 425 on the video. It has a view of where the officers would have been positioned. And as the vehicle accelerates forward and strikes Officer Phillips's vehicle, then Officer Mendrink testifies that it then backs up and strikes Officer Hiney's vehicle. There's testimony in the record. This Nissan did not have any noticeable damage before this felony stop was initiated. However, if you look at the Nissan, there's significant damage on the passenger side of the vehicle, which is where it would have collided with Officer Hiney. So we believe given the proximity of where the officers were located, as well as the fact that they're essentially dodging this vehicle from many different angles, we believe it is reasonable that their focus was on different things and that they did not see what had happened to Officer Phillips. There's something that a lot of the officers refer to as tunnel vision. You also hear the OODA loop where they're going to observe and decide and act. So there are different things that happen to the body when you're placed in that type of stressful situation. We believe that's the explanation for why the officers were not aware of where Officer Phillips was when they began using force. And the testimony from Officer Mendrink is he believed that Officer Phillips had been struck by the vehicle and was being drugged. Officer Stewart actually never saw Officer Phillips get out of the vehicle, so he feared that she was still in the vehicle when it got struck. And Officer Cloney was also concerned not being able to see Officer Phillips. One thing that I think is also important to note is Your Honor had asked earlier whether it mattered if he was exiting the vehicle. Another allegation is that the vehicle was stopped when the shots were fired. Again, we believe that all of the officers have testified that it was accelerating towards them when they shot, and that's one of the reasons that they shot. However, if the court were to look at the Plumhoff case from the Supreme Court, Plumhoff versus Rickard, the first three shots in the Plumhoff case were actually fired when the vehicles were up against one another. The suspect vehicle, the engine was revving, the wheels were spinning, and for that reason the officers believed that the suspect was going to continue flight. So here in this situation, there's a discrepancy about whether or not one of the officers saw multiple strikes or one of the officers saw only one strike. Again, we believe that's attributed to the fact that their focus was on different things during this incident, and we believe reasonably so. However, even if this were a situation where the Nissan collided with Officer Phillips's car, then turns its wheels and begins revving and spinning the wheels as though it's going to proceed towards them, and it's still in contact with Officer Phillips's vehicle, we believe under Plumhoff that would still be justified. Also, there's this argument about the shot in the back, and in Brosseau, another Supreme Court case, that was a situation where the officer did fire from behind at the back of the suspect, and the reason that was given for that use of force was to protect innocent members of the public. They thought that it was possible, the officer thought it was possible that the vehicle was going to strike somebody else that was in the vicinity, and that's the reason why the force was not used. In that particular case, the Supreme Court held that the officer was entitled to qualified immunity. Returning to the issue of the evidence here, one of the arguments that was made is in these situations where the officers are the only surviving witnesses, that the court must take a fairly critical assessment of the forensic evidence, and that comes from a state of Escobedo and Plakas versus Drinsky. However, in both of those cases, this court recited that standard and then went on to say that the attacks on the credibility of the officer did not create genuine issues of material fact. For instance, in Escobedo, the officer said that he was retreating in that situation, and he eventually ran into a tree, and that stopped his retreat. However, when looking at the scene, it's found there's no tree. At most, there might be a sapling, and what the court actually said in that case, or I'm sorry, I'm talking about Plakas there with the tree and the sapling, and the court actually said that's the type of discrepancy that a conspiracy theory might be based upon. In the Escobedo case, there was actually a discrepancy between how far the court found that was insignificant for material fact purposes. So, because there are no material facts, genuine issues of material fact, we ask that the court uphold the district court's decision to grant qualified immunity. Thank you, Your Honors. Thank you, Mr. Rupchurch. Anything further, Mr. Flaxman? If I may, Your Honor, to respond to the question from the court about whether it was reasonable or the officers were entitled to qualified immunity if they shot Mr. Green in the back after he got out of the car, we're asked to look at Brousseau, which is a case where the driver of the car was in the vehicle, and he was being a menace to other people when he was shot while driving the vehicle. In this case, the evidence from the two defendants is that Mr. Green got out of the car, nobody saw a gun in either of his hands, he didn't say anything, he looked like he had not been hit, and then he ends up with these two injuries, one through the heart and one through the right leg, both which came through the back. The defense offers some hypotheses on appeal about how those could have happened. These arguments, these theories are not consistent with the officer's testimony that they were shooting at Mr. Green from the front and from the side, and there's no evidence that Mr. Green turned in a way that would allow him to be shot from the back of the leg or the back while he was in the car. The evidence that we have to accept in the light most favorable to get out of the car as if nothing had happened, and then unexplainedly was shot twice in the back. This requires a trial, not summary judgment. Thank you. Thank you, Mr. Flaxman. The case is taken under advisement. The court will take a 10-minute recess before calling the next case. Thank you.